IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| LIONEL WHITE, JR., | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, Former | ) | |
| CHICAGO POLICE SERGEANT | ) | |
| RONALD WATTS, SERGEANT | ) | |
| ALVIN JONES, OFFICER | ) | |
| ELSWORTH J. SMITH, JR., | ) | |
| Former CHICAGO POLICE | ) | |
| OFFICER KALLATT MOHAMMED, | ) | |
| OFFICER ROBERT GONZALEZ, | ) | |
| OFFICER MANUEL LEANO, | ) | |
| OFFICER BRIAN BOLTON, | ) | |
| OFFICER DOUGLAS NICHOLS, | ) | |
| PHILIP J.CLINE, KAREN ROWAN, | ) | |
| DEBRA KIRBY, | ) | |
| and other as-yet-unidentified officers | ) | |
| of the Chicago Police Department, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Lionel White, Jr., by his attorneys, Loevy & Loevy, hereby complains

against Defendants, City of Chicago, former Chicago Police Sergeant Ronald Watts,

Sergeant Alvin Jones, former Chicago Police Officer Kallatt Mohammed, Officer

Elsworth J. Smith, Jr., Officer Robert Gonzalez, Officer Manuel Leano, Officer

Brian Bolton, Officer Douglas Nichols, Philip J. Cline, Karen Rowan, Debra Kirby,

and other as-yet-unidentified officers of the Chicago Police Department, and states

as follows:

## Introduction

1.  Lionel White, Jr., was convicted of an offense he did not commit.

2.  Chicago police officers fabricated evidence against Mr. White and placed him under arrest for a crime that never happened.

3.  In July 2006, officers arrested then-17-year-old Mr. White at the Ida B. Wells Homes, a public housing project heavily patrolled by corrupt Chicago police officers.

4.  At the Ida B. Wells housing complex, officers regularly solicited bribes, planted narcotics and other drugs, and accused residents and visitors—including Mr. White—of possessing drugs they did not possess.

5.  In retaliation for a false arrest complaint initiated by his father, officers continued their pattern of illegal behavior by falsifying drug charges against Mr. White that led to his criminal prosecution, probation, and subsequent felony record.

6.  Despite his innocence, Mr. White accepted a plea deal, fearing additional time in county jail absent a plea.

7.  After Mr. White had already completed his parole, Defendants former Chicago Police Sergeant Ronald Watts and former Chicago Police Officer Kallatt Mohammed were caught on tape engaging in the exact form of misconduct that led to Mr. White's falsified arrest and wrongful conviction.

8.  The federal government charged Watts and Mohammed criminally, and the disgraced officers pled guilty and served sentences in federal prison.

9.  Over time, evidence has come to light showing Watts and his police team members engaged in a regular pattern of criminal misconduct against public

2

housing residents and visitors, and that Chicago Police Department officials knew about that pattern at least as far back as 2004.

10.  For example, on or after November 16, 2017, following the decision of the Cook County State's Attorney's Office (CCSAO) to vacate the convictions of 15 individuals—including Mr. White—Defendants Sergeant Alvin Jones and Officer Elsworth J. Smith, Jr., along with other members of Watts's crew still serving as police officers, were placed on desk duty.

11.  In addition, the CCSAO will no longer call Defendant Jones as a witness "due to concerns about [his] credibility and alleged involvement in the misconduct of Sergeant Watts."

12.  Through this lawsuit, Mr. White seeks accountability and compensation for the deprivation of his liberty that resulted from Defendants' misconduct.

### Jurisdiction and Venue

13.  This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the Constitution of the United States.

14.  This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367.

15.  Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and Defendant City of Chicago is a municipal corporation located here. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## The Parties

16.   Mr. White is 29 years old. He currently lives and works in Chicago.

17.   At all relevant times, former Chicago Police Sergeant Ronald Watts, Sergeant Alvin Jones, Chicago Police Officer Elsworth J. Smith, Jr., Officer Robert Gonzalez, Officer Manuel Leano, Officer Brian Bolton, Officer Douglas Nichols, Jr., and former Officer Kallatt Mohammed were Chicago police officers employed by the City of Chicago and acting within the scope of their employment and under color of law. Collectively, these individual Defendants are referred to as "Defendant Officers."

18.   At all relevant times, Defendant Watts was a leader of the Second District Tactical Team that worked the Ida B. Wells housing complex.

19.   Defendants Jones, Smith, Gonzalez, Leano, Bolton, Nichols, and Mohammed worked on Watts's tactical team.

20.   At all relevant times, Defendant Phillip J. Cline was the Superintendent of the Chicago Police Department.

21.   At all relevant times, Defendants Karen Rowan and Debra Kirby were Assistant Deputy Superintendents of the Chicago Police Department, acting as the head of Internal Affairs. Collectively, these Defendantsand Defendant Cline are referred to as "Defendant Supervisory Officers."

22.   Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois. The City operates the Chicago Police Department (CPD) and is responsible for the policies, practices, and customs of the City and CPD.

## Factual Background

23.   On July 23, 2006, Mr. White was outside 574 E. 36th St. at the Ida B. Wells housing complex. He was doing nothing illegal and did not have any drugs.

24.   At the time, the complex was actively patrolled by a tactical team of CPD officers, led by Defendant Watts.

25.   Watts and his tactical team members were well known to Mr. White and the residents of Ida B. Wells. They maintained a visible presence and had a reputation in the community for harassing young black men and women.

26.   Mr. White knew that Defendants Watts and Jones had previously wrongfully arrested and framed his father, Lionel White, Sr. ("White Sr."), and that White, Sr., had filed a complaint about the arrest with the Office of Professional Standards (OPS) on June 12, 2006. The complaint alleged that Defendant Jones in particular beat White, Sr. severely during a false arrest on April 24, 2006, leading to his hospitalization.

27.   Watts and his crew's pattern of harassment continued with Mr. White.

## Defendant Officers Fabricate a Drug Case

28.   About a month after White, Sr., filed his OPS complaint, on July 23, 2006, Mr. White was at Ida B. Wells when someone indicated that Defendant Watts was coming to the complex. Mr. White decided to leave the area, because he was aware that Watts had framed his father and that Watts and his team would often arrest people even if they were not doing anything illegal.

29. As Mr. White tried to leave, several police cars pulled up to the front and back of the building near where Mr. White stood, and Defendants Watts, Mohammed, Jones, and Smith exited their vehicles.

30. Defendant Watts grabbed Mr. White and forced him against the wall of the building. When Mr. White told Watts that he did not have any drugs, Watts told Mr. White to take the issue up with Defendant Jones.

31. Watts and the other officers—including Defendants Mohammed, Jones, and Bolton—then created a false arrest report indicating that Mr. White was observed selling narcotics, a Class X felony.

## Mr. White Is Prosecuted and Convicted

32. On the basis of the false reports that the Defendant Officers prepared, the State prosecuted Mr. White for drug crimes.

33. Facing the possibility of false, but potentially damning, testimony from Watts and his crew, Mr. White agreed to take a plea deal because he was scared of spending more time in county jail.

34. He was forced to undergo years of intense probation, which included a 7 p.m. to 7 a.m. curfew, being subject to monthly drug testing, having law enforcement enter and search his home on a regularly scheduled basis, and having to regularly travel to visit his probation officer in Markham, Illinois.

## Emboldened by the City's Code of Silence, Defendant Watts and His Crew Engaged in a Pattern of Misconduct That Spanned at Least a Decade

35. It was no secret within CPD that Watts and his crew engaged in the type of misconduct that Mr. White experienced firsthand.

36.   Government officials, including those with the City of Chicago, knew about Watts and his crew's alleged misconduct as early as 1999.

37.   By 2004, an FBI investigation into Watts and his team was underway. The FBI investigation took place with the knowledge and occasional participation of the Chicago Police Department's Internal Affairs Division (IAD).

38.   Because IAD was kept abreast of the FBI investigation, by 2004, City officials—including but not limited to the head of IAD and CPD Superintendent Philip J. Cline—were aware of credible allegations that Watts and his team were extorting and soliciting bribes from drug dealers.

39.   According to another source who was interviewed, Watts used a drug dealer named "Big Shorty" to run drugs at the Ida B. Wells complex. Big Shorty would sell the drugs, turning profits over to Watts in exchange for Watts's protection. According to the source, Watts also used drug dealers as phony informants to obtain illegitimate search warrants and offered to let arrestees go if they provided him with weapons.

40.   Targets of the FBI investigation extended beyond Watts to members of his tactical team, including Defendants Jones, Mohammed, and Smith.

41.   By 2010, the FBI investigation generated evidence showing that Watts engaged in systematic extortion of drug dealers, theft, possession and distribution of drugs for money, planting drugs on subjects, and paying informants with drugs.

42.   Investigators also determined that Watts and his subordinates had engaged in these activities for the past 10 years.

## Watts and Mohammed Are Charged with Federal Crimes

43. In 2012, after engaging in criminal misconduct for at least a decade, Defendants Watts and Mohammed were caught red-handed shaking down a person they thought was a drug courier. In fact, he was an agent for the FBI.

44. The U.S. government subsequently charged Watts and Mohammed with federal crimes.

45. Watts and Mohammed each pled guilty to federal criminal charges and were sentenced to terms of imprisonment. *See United States v. Watts*, No. 12-CR-87-1 (N.D. Ill.); *United States v. Mohammed*, No. 12-CR-87-2 (N.D. Ill.).

46. In its sentencing memorandum in the Watts case, the government explained that "[f]or years," "the defendant [Watts] used his badge and his position as a sergeant with the Chicago Police Department to shield his own criminal activity from law enforcement scrutiny." His crimes included "stealing drug money and extorting protection payments" from the individuals he was sworn to protect and serve.

47. The government revealed that, for years, and on numerous occasions, Defendants Watts and Mohammed extorted tens of thousands of dollars in bribes from individuals at the Ida B. Wells Homes as part of their duties with the CPD.

48. During the sentencing hearing, the government urged Judge Sharon Johnson Coleman to "consider the other criminal conduct that the defendant [Watts] engaged in throughout the course of his career as a police officer." The government specifically noted that during the federal investigation, Watts "did

other things such as putting a false case on the confidential source that was involved in our investigation. . . . [and having] him arrested on drug charges. And the source . . . felt he had no chance of successfully fighting that case so he pled guilty to a crime he didn't commit." The federal prosecutor wondered aloud "how many times [Watts] might have done something similar when the government was not involved."

49. Following the federal indictments of Watts and Mohammed, City officials made efforts to downplay the magnitude of Watts's criminal enterprise.

50. Notwithstanding the evidence investigators had amassed over the years pointing to a wide, decade-long criminal enterprise, CPD Superintendent Garry McCarthy publicly stated, "There is nobody involved other than the two officers who were arrested." As described in more detail below, that statement was incorrect.

### The City's "Code of Silence"

51. While the federal government was investigating Watts and his crew, a "code of silence" existed within the Chicago Police Department.

52. Under this code, police officers are expected to conceal each other's misconduct—in contravention of their sworn duties—and penalties for breaking the code of silence within the CPD are severe.

53. As one CPD officer has explained, "[The Chicago Police Academy told officers] over and over again we do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or

what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

54. Pursuant to this "code of silence," each of the Defendant Officers concealed information from Mr. White that Watts and his team members were in fact engaged in a wide-ranging pattern of misconduct. Had this information been disclosed, Mr. White would have used it to impeach the officers' accounts, changing the outcome of the criminal proceedings instituted against him.

55. Also, consistent with this "code of silence," the few people who stood up to Watts and his crew and/or attempted to report his misconduct were either ignored or punished, and the Defendant Officers continued to engage in misconduct with impunity.

### The Careers of CPD Officers Daniel Echeverria and Shannon Spaulding Are Nearly Ruined

56. In 2006, two Chicago police officers, Daniel Echeverria and Shannon Spaulding, learned credible information from arrestees that Watts and his crew were engaged in illegal drug activity.

57. Officer Echeverria took the allegation seriously and reported it to a CPD supervisor. The supervisor made clear that he was not interested in hearing about the allegation and directed Echeverria not to document it.

58. Echeverria and Spaulding subsequently reported the allegations about Watts and his crew to the FBI. Soon thereafter, Echeverria and Spaulding began

cooperating with the FBI, actively assisting the FBI's investigation of Watts and his crew.

59.  When their cooperation became known to officers within their CPD chain of command, Spaulding and Echeverria were labeled "rats" within the Department, their lives were threatened, and they endured all manner of professional retaliation by members of the CPD.

60.  Spaulding and Echeverria subsequently sued the City for the retaliation they suffered for blowing the whistle on Watts and his crew. On the eve of trial in that case, the City settled for $2 million.

### CPD Officer Michael Spaargaren's Life Is Threatened

61.  Sometime in the mid-2000s, CPD Officer Michael Spaargaren was assigned to work with Watts in public housing.

62.  Spaargaren observed that Watts did not inventory drugs and money that officers seized during arrests, and he confronted Watts about the misconduct.

63.  In response, Watts threatened to plant a false case against Spaargaren and made veiled threats to kill him.

64.  A CPD lieutenant in the chain of command subsequently warned Spaargaren to keep his mouth shut or his life would be in danger.

65.  Fearful for his life, Spaargaren opted to take a one-and-a-half-year leave of absence from CPD rather than continue to work under Watts.

## Citizen Complaints Went Nowhere

66. Defendants Watts, Mohammed, and other members of Watts's tactical team accumulated dozens of citizen complaints concerning violations of their civil rights over the years, beginning well before the misconduct Defendants committed against Mr. White, yet the City did nothing to stop their wrongdoing.

67. On information and belief, complaints that the City did take the time to investigate largely boiled down to he-said-she-said situations between the officer and the citizen, and the City's policy was to resolve those disputes in the officers' favor, no matter how many citizens came forward with the same type of complaint.

## The City Turned a Blind Eye Toward Watts and His Crew's Clear Pattern of Alleged Misconduct

68. Despite all of the evidence amassed over the years demonstrating a clear pattern and practice of Defendant Officers' criminal misconduct, on information and belief, the City never undertook its own investigation.

69. As City officials were aware, the purpose of the FBI investigation was to investigate and prosecute criminal activity, not to discipline and control the City's Police Department.

70. Nothing about the FBI investigation relieved the City of its fundamental responsibility to supervise, discipline, and control its officers. Nevertheless, the City completely abdicated this responsibility, allowing the widespread misconduct to continue unabated throughout the FBI's criminal investigation of Watts and his crew.

71.   During the FBI investigation, which spanned at least eight years, City officials had reason to believe that Watts and his crew were engaged in ongoing criminal activity on the streets—extorting drug dealers and framing citizens for crimes they did not commit—yet City officials took no steps to prevent these abuses from occurring.

72.   Instead, the City officials let officers on Watts's crew continue to pursue criminal charges against citizens like Mr. White and to falsify arrest reports and testimony in such cases.

73.   Even worse, City officials withheld information they had about the officers' pattern of transgressions, information that citizens like Mr. White could have used to impeach the corrupt officers and defend against the bogus criminal charges placed upon them.

### Mr. White's Exoneration

74.   After Defendant Watts' and his crew's corruption came to light, on September 12, 2017, Mr. White joined a group of similarly situated innocent victims, and together they filed a Consolidated Petition for Relief from Judgment and to Vacate Convictions Pursuant to 735 ILCS 5/2-1401 ("Consolidated Petition").

75.   On November 16, 2017, upon the State's motion, Judge LeRoy K. Martin, Jr., vacated all of the 18 convictions, including Mr. White's, and the State *nolle prossed* all charges related to the convictions.

76.   In commenting on the extraordinary decision to agree to vacate all of the convictions, the director of the Cook County State's Attorney's Office's Conviction Integrity Unit, Mark Rotert, stated, "In these cases, we concluded, unfortunately,

13

that police were not being truthful and we couldn't have confidence in the integrity of their reports and their testimony."

77.   As a result, the CCSAO will no longer call certain member of Watts's crew, including Defendant Jones, as witnesses in any pending or future matters because of their credibility concerns and alleged involvement in misconduct.

78.   Shortly after the convictions were vacated, Superintendent Johnson placed Defendants Jones, Smith, Bolton, Gonzalez, Leano, and Nichols, along with other members of Watts's crew, on desk duty.

### Mr. White's Damages

79.   The Defendants' misconduct and false accusations subjected Mr. White to unfair criminal proceedings, a number of months in Cook County jail, a felony conviction, and two years of intense probation, before he was finally exonerated.

80.   At only 17, Mr. White was targeted by corrupt police officers in retaliation for a complaint filed by his father, who was also framed by Watts and his crew. This police harassment and wrongful conviction has caused Mr. White significant emotional pain and suffering and irrevocably marred his young adulthood. He was kicked off his high school basketball team. For more than 10 years, Mr. White had to live with a felony record he did not deserve. This made gaining meaningful employment next to impossible.

81.   As a result of the foregoing, Mr. White has suffered emotional damages proximately caused by Defendants' wrongdoing.

### Count I: 42 U.S.C. § 1983 – Due Process

82.   Each paragraph of this Complaint is incorporated as if restated fully herein.

83. In the manner described more fully above, Defendant Officers, while acting as investigators, individually, jointly, and in conspiracy with each other deprived Plaintiff of his constitutional right to due process and a fair trial.

84. In the manner described more fully above, Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, and knowingly fabricated false evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

85. Likewise, in the manner described more fully above, Defendants Philip J. Cline, Karen Rowan, Debra Kirby, and other as-yet-unidentified CPD supervisors, had knowledge of Watts and his crew's pattern of misconduct. These Defendant Supervisory Officers knew of a substantial risk that Watts and his team would violate the rights of Mr. White and other residents and visitors of the Ida B. Wells Homes, and they deliberately chose a course of action that allowed those abuses to continue, thereby condoning those abuses.

86. The constitutional injuries complained of herein were proximately caused by the intentional misconduct of Defendant Supervisory Officers, or were proximately caused when Defendant Supervisory Officers were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

87. In addition, Defendant Supervisory Officers themselves concealed exculpatory evidence from Mr. White, specifically information about Watts and his

team's pattern of misconduct. In this way, Defendant Supervisory Officers violated Mr. White's due process right to a fair trial deliberately and with reckless disregard.

88. Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, denying him his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff could not and would not have been prosecuted.

89. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others and with total disregard for the truth and for Mr. White's clear innocence.

90. Defendants' actions were taken under color of law and within the scope of their employment.

91. Defendant City of Chicago is also directly liable for the injuries described in this Count, because the City and CPD maintained official policies and customs that were the moving force behind the violation of Plaintiff's rights, and the actions of the final policymaking officials for the City and CPD were the moving force behind the violation of Plaintiff's rights.

92. At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago maintained a system that violated the due process rights of criminal defendants like Mr. White by concealing exculpatory evidence of Chicago police officers' patterns of misconduct.

93. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago had notice of a widespread practice by its officers and agents under which criminal suspects, such as Mr. White, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

94. As a matter of both policy and practice, Defendant City directly encourages, and is thereby the animating force behind, the very type of misconduct at issue here by failing to adequately train, supervise, control, and discipline its police officers, such that its failure to do so manifests deliberate indifference. Defendant City's practices lead police officers in the City of Chicago to believe that their actions will never be scrutinized and, in that way, directly encourage further abuses such as those that Mr. White endured.

95. The above-described widespread practices, which were so well-settled as to constitute the *de facto* policy of the City of Chicago, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. These widespread practices were allowed to flourish because Defendant City and the CPD declined to implement sufficient policies or training, even though the need for such policies and training was obvious. Defendant City and the CPD also declined to implement any

17

legitimate mechanism for oversight or punishment of officers, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

96.   Furthermore, the misconduct described in this Complaint was undertaken pursuant to the policy and practices of Defendant City in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago and the CPD, or were actually committed by persons with such final policymaking authority.

97.   Indeed, municipal policymakers have long been aware of Defendant City's policy and practice of failing to properly train, monitor, investigate, and discipline misconduct by its police officers but have failed to take action to remedy the problem.

98.   For example, at a City Council hearing on September 28, 1999, in response to two high-profile unjustified police shootings, Superintendent Terry Hillard noted the need for better in-service training on the use of force, early detection of potential problem officers, and officer accountability for the use of force.

99.   In June 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

18

100. In 2001, the Justice Coalition of Greater Chicago (JCGC), a coalition of more than a hundred community groups, confirmed the findings of that resolution, concluding that the CPD lacked many of the basic tools necessary to identify, monitor, punish, and prevent police misconduct. The JCGC findings were presented to Mayor Richard Daley, Superintendent Hillard, and the Chicago Police Board.

101. Despite municipal policymakers' knowledge of the City's failed policies and practices to adequately train, supervise, investigate, discipline, and control its police officers, nothing was done to remedy these problems.

102. As a result, the CPD has continued to respond to complaints of police misconduct inadequately and with undue delay and to recommend discipline in a disproportionately small number of cases.

103. Indeed, by its own admissions, when a citizen complains that his or her civil rights were violated by police officers, the City sides with the police officer and concludes that no violation occurred more than 99% of the time.

104. Notably, Defendants Watts and Mohammed are not the first Chicago police officers who were allowed to abuse citizens with impunity over a period of years while the City turned a blind eye.

105. For instance, in 2001, Chicago Police Officer Joseph Miedzianowski was convicted on federal crime charges, including racketeering and drug conspiracy. The jury found that Miedzianowski engaged in corruption for much of his 22-year police career, using street informants to shake down drug dealers and sell drugs.

106. Miedzianowski, like Defendant Officers in this case, had accumulated dozens of complaints over the years, which Defendant City routinely deemed unfounded or not sustained.

107. Likewise, in 2011, Chicago Police Officer Jerome Finnigan was convicted and sentenced on federal criminal charges, including a charge of attempting to hire someone to kill a police officer who Finnigan believed would be a witness against him on his own corruption charges in state court.

108. Finnigan was part of a group of officers in Defendant City's Special Operations Section that carried out robberies, home invasions, unlawful searches and seizures, and other crimes.

109. Finnigan and his crew engaged in their misconduct at about the same time that Defendant Watts and his crew targeted Mr. White.

110. Finnigan, like Defendant Officers in this case, had accumulated dozens of citizen complaints over the years, which Defendant City routinely deemed unfounded or not sustained.

111. At his sentencing hearing in 2011, Finnigan stated, "You know, my bosses knew what I was doing out there, and it went on and on. And this wasn't the exception to the rule. This was the rule."

112. In the case of *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill), a federal jury found that, as of 1994, the CPD maintained a code of silence that facilitated misconduct committed by Miedzianowski.

20

113. Likewise, in the case of *Obrycka v. City of Chicago et al.*, No. 07 CV 2372 (N.D. Ill.) , a jury found that as of February 2007 "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

114. The same constitutionally-defective oversight system in place during the time periods at issue in the *Klipfel* case and in the *Obrycka* case was also in place in 2006, when Mr. White suffered the abuse described above.

115. The same code of silence in place at the CPD during the time periods at issue in the *Klipfel* case and in the *Obryka* case was also in place in 2006, when Mr. White suffered the abuse describe above.

116. Indeed, the problems found to exist by the jury in *Klipfel* and *Obrycka* continue to this day. In December 2015, Mayor Rahm Emanuel acknowledged that a "code of silence" exists within the Chicago Police Department that encourages cover-ups of police misconduct and that the City's attempts to deal with police abuse and corruption have never been adequate.

117. The policies, practices, and customs set forth above were the moving force behind the constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

118. Defendant City's investigation of complaints is characterized by unreasonably long delays, despite the relatively straightforward nature of many misconduct claims.

119. Although Defendant City has long been aware that its supervision, training, and discipline of police officers is entirely inadequate, it has not enacted any substantive measures to address that deficiency.

120. Instead, Defendant City continues to inadequately investigate citizen complaints and take action against officers when necessary. It has also failed to modify its officer training programs to reduce misconduct against Chicago residents and to implement a system to identify and track repeat offenders, districts, or units.

121. Plaintiff's injuries were caused by officers, agents, and employees of Defendant City of Chicago and the CPD, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## Count II: 42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Pretrial Detention

122. Each paragraph of this Complaint is incorporated as if restated fully herein.

123. In the manner described more fully above, Defendants, while acting as investigators, individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

124. In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

125. The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

22

126. Defendants deprived Plaintiff of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty.

127. In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent through Defendants' fabrication and suppression of evidence.

128. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard for the truth and for Plaintiff's clear innocence.

129. The Defendants' actions were taken under color of law and within the scope of their employment.

130. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

131. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

### Count III: 42 U.S.C. § 1983 – Failure to Intervene

132. Each paragraph of this Complaint is incorporated as if restated fully herein.

133. In the manner described more fully above, during the constitutional violations described herein, Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

134. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others and with total disregard for the truth and for Plaintiff's innocence.

135. The Defendants' actions were taken under color of law and within the scope of their employment.

136. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

137. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

### Count IV: 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

138. Each paragraph of this Complaint is incorporated as if restated fully herein.

139. Prior to Plaintiff's conviction, all of the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described above.

24

140. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of his rights.

141. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

142. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard for the truth and for Plaintiff's innocence.

143. The Defendants' actions were taken under color of law and within the scope of their employment.

144. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

145. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

## Count V: Illinois Law – Malicious Prosecution

146. Each paragraph of this Complaint is incorporated as if restated fully herein.

147. In the manner described more fully above, Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

148. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

149. The Defendants' actions were taken under color of law and within the scope of their employment.

150. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count VI: Illinois Law – Intentional Infliction of Emotional Distress

151. Each paragraph of this Complaint is incorporated as if restated fully herein.

152. The actions, omissions, and conduct of Defendant Officers, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

153. The Defendants' actions were taken under color of law and within the scope of their employment.

154. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VII: Illinois Law – Civil Conspiracy

155. Each paragraph of this Complaint is incorporated as if restated fully herein.

156. As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of his rights.

157. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

158. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard for the truth and for Plaintiff's innocence.

159. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VIII: Illinois Law – *Respondeat Superior*

160. Each paragraph of this Complaint is incorporated as if restated fully herein.

161. While committing the acts alleged in the preceding paragraphs, Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

162. Defendant City of Chicago is liable as principal for all torts committed by their agents.

## Count IX: Illinois Law – Indemnification

163. Each paragraph of this Complaint is incorporated as if restated fully herein.

164. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

165. Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff Lionel White, Jr., respectfully requests that this Court enter a judgment in his favor and against the City of Chicago, former Chicago Police Sergeant Ronald Watts, former Chicago Police Officer Kallatt Mohammed, Sergeant Alvin Jones, Officer Elsworth J. Smith, Jr., Officer Robert Gonzalez, Officer Manuel Leano, Officer Brian Bolton, Officer Douglas Nichols, Jr., Phillip J. Cline, Karen Rowan, Debra Kirby, and other as-yet-unidentified officers of the Chicago Police Department, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, Lionel White, Jr., hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Theresa Kleinhaus
One of Plaintiffs' Attorneys

Jon Loevy
Arthur Loevy
Scott Rauscher
Theresa Kleinhaus
Joshua Tepfer
Sean Starr
Loevy & Loevy
311 North Aberdeen Street
Third Floor
Chicago, Illinois 60607
Phone: (312) 243-5900